JOSEPH W. PERRINE and JULIA A. PERRINE,
Complainants,

STANDARD INVESTMENT COMPANY and THOMAS A. WALKER,
NORMAN C. NORMAN, PAT MCGEE, and MORRIS LEIBO-
WITZ,
Intervening Complainants,

*vs.*

THE PENNROAD CORPORATION, a corporation of the State of
Delaware, THE PENNSYLVANIA RAILROAD COMPANY,
a corporation of the Commonwealth of Pennsylvania,
WILLIAM W. ATTERBURY, EFFINGHAM B. MORRIS, JAY
COOKE, LEVI L. RUE, RICHARD B. MELLON, ALBERT J.
COUNTY, HENRY H. LEE, JOSEPH WAYNE, Jr., and
A. H. S. POST; and EFFINGHAM B. MORRIS, WILLIAM
M. POTTS and JOSEPH WAYNE, Jr., AS VOTING TRUS-
TEES UNDER VOTING TRUST AGREEMENT DATED MAY 1,
1929, IN RESPECT OF THE COMMON STOCK OF THE PENN-
ROAD CORPORATION, a corporation of the State of
Delaware.

*New Castle, August 9, 1945.*

*James R. Morford,* of the firm of Marvel & Morford, and *Morris Wolf,* of the firm of Wolf, Block, Schorr, & Solis-Cohen, of Philadelphia, Pa., for Pennroad Corporation, petitioner.

*James M. Tunnell, Jr.,* and *Joseph B. Keenan,* of Washington, D. C., for complainants.

*Stewart Lynch,* and *Leo Brady* and *Herman Keller,* of the firm of Gordon, Brady & Keller, all of New York City, for Matilda J. Feldman and other objecting stockholders.

*James H. Hughes and Max Terry,* for Norman C. Norman, intervenor.

*Maurice B. Blumenthal and Daniel W. Blumenthal,* both of New York City, for Pennroad Stockholders' Protective Committee.

*Charles H. Tuttle,* of the firm of Breed, Abbott & Morgan, all of New York City, for Pennroad Investors' Commitee.

*Frank M. Swacker,* of New York City, an original cosolicitor for complainant, in his own behalf.

In addition to the foregoing, the following persons also appeared, made some application, or attempted to participate in the hearing: Hirsh W. Stalberg, of Philadelphia, Pa., for Freda S. Kauffman and Patrick Conner, plaintiffs intervenors in other stockholders' suits (Overfield-Weigle actions, described later in this opinion) ; Edwin Hall, of Philadelphia, Pa., for himself, Fannie Gray Hall and R. Gray Hall, individually, and as trustees, stockholders of Pennsylvania Railroad Company; H. Albert Young, of Wilmington, and Archibald Palmer, of New York City, for Anna C. Dickheiser and Edward S. Birn as stockholders of the Pennsylvania Railroad Company, and Edward S. Birn and Louis Elion as stockholders of Pennroad Corporation; William M. Morgan and Walter H. Hopple, stockholders, appeared in their own behalf.

PEARSON, Vice-Chancellor: The ultimate question for determination is whether this court should approve a certain settlement agreement designed to bring about a dismissal of the bill in the present case and a settlement and termination of the claim with which the bill is concerned.

General statements of the content of the bill may be found in the Chancellor's opinions: *Perrine v. Pennroad Corp., supra.* The principal alleged complaint of significance at the present time is that The Pennroad Corporation (for brevity, Pennroad) has sustained substantial losses as a result of action of various persons, the individual defendants. These persons were directors or officers of the Pennsylvania Railroad Company (for brevity, Pennsylvania), brought about the organization of Pennroad, and became its officers and directors and the voting trustees of its stock.

In substance, it is contended that these persons in administering the affairs of Pennroad, and particularly in investing its capital funds, were motivated primarily by a desire to promote the corporate interests of Pennsylvania, rather than the corporate interests of Pennroad, with consequent damage to Pennroad. The individual defendants and Pennsylvania are charged with liability for the losses of Pennroad. The voting trust complained of in the bill terminated May 1, 1939. Jurisdiction over the individual defendants in their individual capacity has not been obtained. The other defendants filed answers. The suit has not been tried, and until a few months ago, had long remained inactive.

Some seven years after the bill was filed here, two suits were brought in the United States District Court for the Eastern District of Pennsylvania by stockholders of Pennroad, against Pennroad, Pennsylvania, and certain individuals. These suits, which I shall call the Overfield-Weigle cases, were ultimately tried together and the basic complaint asserted is substantially similar to the complaint in the instant case. Several opinions were rendered by the federal courts: *Overfield v. Pennroad Corporation*, (3 *Cir.*,) 113 *F.2d* 6; *Id.*, (*D.C.*) 39 *F.Supp.* 482; *Id.*, (*D.C.*) 42 *F.Supp.* 586; *Id.*, (*D.C.*,) 48 *F.Supp.* 1008; *Id.*, (3 *Cir.*,) 146 *F.2d* 889. The opinions appearing under the last three citations, are of particular interest here, and frequent reference will be made to them.

In the first of these opinions, the District Court, Judge Welsh, held and reiterated that the individual defendants were not guilty of intentional moral delinquency, but rather of "constructive" fraud, saying (42 *F.Supp.* 586, 610):

"* * * the directors, who are men of unimpeachable character and integrity, acting in the interest of serving their companies, have misconceived their duties toward the Pennroad certificate holders, and have created instrumentalities by means of which risks and losses were passed on to such holders in the process of serving Pennsylvania Railroad. * * *

"The liability of the defendants in this case is based upon their

dealings with Pennroad's property and powers in a manner designed to benefit Pennsylvania Railroad. It exists regardless of any degree of good faith exercised because the defendants planned the domination and continued control of Pennroad which resulted in losses to Pennroad and benefit to Pennsylvania Railroad. Their breach of duty and abuse of fiduciary obligations did not involve intentional moral delinquency and certainly did not bring this case into the category of those in which controlling corporations have deliberately set out to wreck a subsidiary for their own advantage. Their acts, however, did amount to what the law considers a disregard of duty or breach of trust and a constructive fraud upon the rights of the certificate holders."

Judge Welsh held that the cases were barred by the Pennsylvania statute of limitations as to the individual defendants; that the defendant Pennsylvania was liable for the entire amount of capital lost in one of eight investment transactions complained of, together with net profits received by Pennsylvania and attributable to the operation of the company in which Pennroad had invested; and that a further inquiry should be made with respect to the other seven criticized investments "with the view to establishing a fair and equitable measurement of the redress to be granted and of the financial obligation to be imposed." Judge Welsh appointed three investment experts who made a report and were examined in open court as to the basis of their report. Thereafter, he filed a supplemental opinion (48 *F.Supp.* 1008) in which he found liability with respect to four of the eight criticized investments, and entered a judgment against Pennsylvania for $22,104,515. Pennsylvania and the complaining stockholders appealed to the Circuit Court of Appeals. On December 28, 1944, opinions were filed by that court. Each of the three Judges wrote an opinion. The majority decided that the judgment of the District Court in favor of the individual defendants should be affirmed and that the judgment against Pennsylvania should be reversed, and the case remanded with directions to enter judgment in favor of Pennsylvania. The court held that state statutes of limitations barred the

claims. Judge Goodrich said in the opinion of the court (146 *F.2d* 889, 899) :

"In this discussion we have endeavored to refrain carefully from passing any opinion upon the merits of the plaintiffs' claims."

Judge Biggs filed a long and vigorous dissent and concluded that Pennsylvania and the individual defendants were liable for the full amount of Pennroad's losses in each of the eight transactions (subject to certain adjustments) together with interest at six per cent. The mandate of the Circuit Court had not been issued to the District Court at the time of the hearing on the present petition. This was because applications had been granted by the Circuit Court extending the time for filing a petition for rehearing.

In January 1945, negotiations were begun between Pennsylvania and Pennroad for a settlement of the controversies, culminating in a proposed compromise, approved by the boards of directors of each company, and the attorneys representing the shareholders and Pennroad in the Overfield-Weigle cases. An agreement was executed by the companies which provides briefly thus:

1. Pennsylvania agrees to pay Pennroad fifteen million dollars, subject to the approval of this court and subject to the performance or happening of the conditions which follow.

2. Prior to the payment, the present suit shall have been settled and ended in accordance with laws and the rules of this court.

3. Prior to the payment, the Overfield-Weigle suits shall have been so disposed of that the mandate of the Circuit Court of Appeals now directed to be entered shall go forward to the District Court and the bill dismissed accordingly, but without costs; and the time for applying for a writ of certiorai shall have elapsed.

4. Pennroad covenants to bring no further suits or

engage in any controversy with Pennsylvania or its directors "concerning any matters arising out of the several complaints or the purchases complained of, as set forth in any of the above named suits."

5. Pennroad covenants to deliver releases to Pennsylvania, to the individual defendants named in the suits who are now living, and to the estates of those who are deceased.

6. In case the settlement is not consummated, there shall be no prejudice to any of the parties by reason of making the agreement.

Pennroad filed the instant petition for approval of that agreement. Approval was urged by the intervenor Norman; by a committee called the Pennroad Stockholders' Protective Committee; by two of the three members of another committee called Pennroad Investors' Committee; and by Mr. Swacker, an original co-solicitor for complainants. Since 1936, Daniel O. Hastings, Esquire, has been a co-solicitor for the complainants, but he did not attempt to speak for them in the present proceeding. The complainant Julia A. Perrine (it has been indicated that her co-complainant is dead) is now represented by other solicitors and she opposes the petition and urges that the court should disapprove the settlement agreement and that the case should proceed to trial. Objections on behalf of other stockholders were made. The total number of shares held by the objectants is a subject of dispute, but in no event does it exceed 11,600. More than 6,000,000 shares are outstanding.

Before taking up the petitioner's case, I shall discuss objections raised to the jurisdiction of this court and to the adequacy of the notice of the hearing. From time to time during the hearing, the contention has been made that this court is without jurisdiction to approve the settlement, and objectants have argued that the directors should have gone ahead on their own responsibility, if they wished to settle

the claims, and should not have sought approval of this court. It would seem hardly necessary to affirm that jurisdiction to dismiss the bill of complaint in such manner as to determine finally the controversy which it comprehends (subject, of course, to review on appeal) is but an incident of the acknowledged jurisdiction to entertain and adjudicate the present suit. Where, as here, a settlement of a stockholders' derivative suit is attempted, it is not the practice in the Court of Chancery to approve the compromise or dismiss the bill so as to terminate the controversy involved, merely upon the application of the parties (unless the controversy has been settled, after notice and hearing, before some other court having jurisdiction). Before ordering such a dismissal, it is our practice to set the application down for hearing, and to give notice to stockholders of the corporation concerned, and thus to afford them, as well as the proponents of the settlement, an opportunity to be heard. Hence, it is obvious why the directors have sought court approval of the settlement.

It is further contended that approval of the settlement here would somehow constitute an attempted exercise of jurisdiction with respect to the Overfield-Weigle actions. Specifically, it is charged that such approval would effect a compromise and settlement of those actions in violation of *Rule* 23 (c) of the *Federal Rules of Civil Procedure*, 28 *U.S.C.A.* following *Section* 723c, which provides:

"Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court. * * *"

Admittedly, this court cannot by its decree dismiss those actions or require the Federal Court to do so. The fact is that the settlement agreement contemplates that there shall be done in the Overfield-Weigle actions what the Circuit Court of Appeals has already decided should be done. These suits have been tried on full hearing before the District Court, and likewise heard fully by the Circuit Court of Appeals, and the judges of these courts have filed a total

of seven opinions which, with syllabi, fill more than 115 pages of the Federal Supplement and the Federal Reporter. Although the claim asserted here is substantially the same as that later asserted in the Overfield-Weigle actions (which the objectants, of course, concede) no reason has been suggested why that fact should cause this court to refuse to act to dispose finally of the suit before it. The objectants' contention is of no merit.

Objections have been made concerning the notification given to shareholders of the present hearing. I considered the form and method of notification when the petition was originally presented (all solicitors appearing in the case having been notified in advance of the application), and advised the order prescribing the notice to be given. After reconsideration, I again find the notification appropriate to serve its proper function of apprising shareholders that a hearing would be held upon a particular application at a stated time and place, and informing them that they might be heard, if they wished, with respect to the application. The notification is in conformity with our practice and the objection must fail.

So much for the preliminary objections. In support of the petition, it is urged that the directors acted in good faith in approving the settlement agreements. In this and in the Overfield-Weigle actions, the Pennroad directors originally opposed the stockholders' efforts to enforce the claims asserted. This position was maintained by each successive board, following the advice of Pennroad's counsel, Judge Heiserman, until shortly after the first opinion of Judge Welsh in favor of the plaintiffs. After that opinion came down, Senator Hastings, who had been the chief counsel in the trial of the Overfield-Weigle actions, as well as solicitor for complainants here, demanded that Pennroad change its position, pay the expenses of the litigation, and put on its board of directors persons suggested by the plaintiff stockholders. At a meeting of the board on Feb-

ruary 11, 1942, the payment of expenses, except counsel fees, in the Federal Court suits was authorized. Two directorships were created and a conference with the plaintiff's counsel was also authorized for the purpose of choosing nominees to be submitted for action by the stockholders at their next meeting. In the annual report for 1941, dated February 11, 1942, these matters were reported to the shareholders and there was a discussion at some length of Judge Welsh's opinion. Subsequently, Senator Hastings and Mr. Carroll Dunham, 3rd, were recommended to the stockholders in the proxy statement of the management, and they were elected. Mr. Dunham had some time previously advanced ten thousand dollars from his own funds to pay expenses of the litigation.

At a conference between the president of Pennroad, the chairman of the executive committee, the general counsel and Senator Hastings, the latter was authorized to make a statement to the Federal Court concerning Pennroad's position in the Overfield-Weigle actions. Accordingly, on June 29, 1942, Senator Hastings stated to the court:

"It is important at this time for the court to know and the record to show that Pennroad has changed its position of neutrality to that of active participant in the prosecution of these suits."

At a meeting on July 8 following, the board approved Senator Hastings' statement. Judge Heiserman, who had long advised against participating in the suits, resigned as Pennroad's counsel. The Pennroad board has paid in excess of $100,000 for expenses incurred in the Federal Court suits.

At the meeting of July 8, the board authorized the retention of Mr. Morris Wolf of Philadelphia as special counsel to represent the corporation in various matters in connection with the Overfield-Weigle actions which would not interfere with the conduct of the cases by Senator Hastings. The idea of retaining special counsel for the corporation had been suggested by Senator Hastings. Mr. Wolf had no connections with Pennsylvania, and had had no previous con-

nection with Pennroad or any party to the actions. Mr. Wolf took up with Judge Welsh the matter of fees of the experts which the latter had appointed. The requested charges were reduced by about $50,000. He filed a brief and argued before Judge Welsh in opposition to a contention made by Pennsylvania that Pennroad shareholders who had acquired their shares after the occurrence of the acts complained of had no right of recovery against Pennsylvania in any event, and that any judgment should be cut down proportionately. The court's determination was against Pennsylvania. The Pennroad board consulted with Mr. Wolf and Senator Hastings from time to time. Mr. Wolf had frequent meetings with Senator Hastings, and, in general, they and the attorneys associated with Senator Hastings were in entire harmony with respect to action to be taken. Mr. Wolf attended the argument before the Circuit Court of Appeals and filed a brief on behalf of Pennroad stating that he concurred with the views of Senator Hastings and his associates.

At a meeting of the board on January 10, 1945, Mr. Wolf discussed the result of the reversing decision of the Circuit Court of Appeals which had recently been filed. He recommended that Pennroad should petition for a rehearing. Senator Hastings gave similar advice, and the attorneys began working to this end.

Some days later, negotiations for settlement began after Mr. Pepper, the president of Pennroad, had been told by a friend that Mr. Robert T. McCracken, counsel and director of Pennsylvania, would like to discuss that subject. With the approval of Senator Hastings and Mr. Wolf, Mr. Pepper met Mr. McCracken on January 17 and Mr. McCracken asked him what he would do if offered three or four million dollars. Mr. Pepper said that he would not accept it but that if Mr. McCracken was serious about a settlement, an offer should come from him, and that Mr. Pepper wished to discuss the matter with the chairman of the board and with

counsel. On January 20, he again met Mr. McCracken and the latter offered $7,500,000 in compromise. Mr. Pepper told him that the board would not accept that amount. Mr. McCracken then said that he might be able to increase the offer to $8,500,000, but Mr. Pepper replied that he would not feel inclined to recommend that sum for consideration. He suggested that if an offer of $11,250,000 plus expenses were made, he would present it to the board. Thereafter, Mr. McCracken offered $12,000,000, and that offer was presented to Pennroad's board at a meeting on January 25. After discussion, it was determined that action on the offer should be deferred pending a report to a subsequent meeting of the board, by Senator Hastings and Mr. Wolf after they had conferred with Mr. McCracken for the purpose of attempting to obtain a higher offer. Senator Hastings and Mr. Wolf did confer with Mr. McCracken and Mr. John Dickinson, Pennsylvania's general counsel. Senator Hastings took the position that he would oppose any settlement for less than $16,578,000, roughly three-quarters of the amount of the judgment rendered by the Federal District Court. The representatives of Pennsylvania declined to make such an offer and the negotiations seemed to have reached a stalemate.

A board meeting was scheduled for February 14, and Pennroad's president and chairman of the board agreed that Mr. Wolf should see Mr. McCracken again before the meeting. He did see Mr. McCracken and Mr. Dickinson, and as a result, received an indication from them to the effect that if Pennroad would settle for $15,000,000, Pennsylvania would probably offer that sum. Mr. Wolf reported this to the meeting that day. Eleven of the thirteen directors were present. The situation was fully discussed. Mr. Wolf told the directors he thought that was the top figure Pennsylvania would pay in settlement, and recommended approval. A resolution that the board viewed with favor a settlement for $15,000,000 was passed, Senator Hastings declining to vote. After the meeting, Mr. McCracken made

a definite offer in that amount. Senator Hastings withheld his approval for some time. He consulted with his associates, four law firms who participated in the prosecution of the Federal Court suits against Pennsylvania. He ultimately expressed his approval and that of his associates. He testified:

"Of course, I didn't reach this decision hastily. I didn't do it without the most careful consideration, without consulting with everybody I thought would know anything about it that would help me, and I reached the definite conclusion that this settlement is to the very great interest of the stockholders of Pennroad. I have absolutely no doubt about it."

Pennsylvania's counsel drew up a form of settlement agreement which was then considered by Senator Hastings and Mr. Wolf. The Pennsylvania representatives indicated that they wished the matter of settlement to be presented for court approval in the instant suit rather than in the Overfield-Weigle actions, because they believed that Pennsylvania would thereby have a better chance to deduct the payment as an expense for tax purposes than if a settlement were passed on in the Federal suits, where Pennsylvania already had a favorable decision of the Circuit Court of Appeals.[1] Mr. Wolf was of the view that it might also be advantageous to Pennroad from the standpoint of taxes to proceed in the Delaware suit. But Senator Hastings announced that this would be unacceptable unless some arrangement were made so that the compensation of himself and his associates could be passed upon by Judge Welsh. He said that the trial judge was familiar with the services performed and that there were persons who had served in the Overfield-Weigle actions who had nothing to do with

[1]Complainant's solicitor comments in the brief:

"Pennsylvania by careful manipulation of events seeks to make sure that the bulk of the proffered $15,000,000 would be paid at the expense of the United States Treasury. Apparently the only reason why this matter now appears in the Chancery Court in Delaware is to make as certain as possible that this settlement will cost Pennsylvania less.than a net of $2,250,000."

the Delaware suit. Judge Welsh was consulted and consented to act as arbitrator, without compensation.

The board of directors met on March 1. The settlement agreement was read and considered. The directors present unanimously voted for it and the absent directors (except one in the Armed Forces) later expressed their approval. In addition, the board agreed to enter into a contract for the arbitration of claims of those entitled to compensation for services and expenses in connection with the stockholders' suits against Pennsylvania; the maximum award, including all claimants, whether parties to the arbitration or not, and including the cost of arbitration, to be twenty per cent of the amount of the settlement. The board stipulated, as a condition of such an agreement, that there be notice to all shareholders and an opportunity to be heard before the arbitrator. An agreement was entered into on that basis, but we are not now called upon to decide anything with respect to fees or allowances.

At the hearing, Pennroad's counsel called four of the directors as witnesses: Senator Hastings, Mr. Dunham, Mr. Pepper (president), and Mr. Goodall (chairman of the board). The latter two are the most active directors in the management and conduct of the corporation's affairs. Pennroad's solicitor also produced, at the request of solicitors for complainant and the objecting stockholders, three of the directors and a vice-president who is not a director. None of the directors who testified owned any Pennsylvania stock and none were shown to have any financial interest of any kind in Pennsylvania. None of them discussed the settlement negotiations or the settlement agreement (apart from participation by Messrs. Pepper and Goodall in the negotiations themselves) with anyone connected with Pennsylvania. None of the directors were defendants in this or the Overfield-Weigle actions, and none were in office when the criticized investments were made. All of the directors (excepting the most recent appointee who fills a

vacancy created by the death of a member) now hold office by virtue of election by the shareholders by overwhelming votes. The largest number of shares voted against any of the present directors is 34,516; whereas, 3,104,146 shares were voted in favor of the same director. There is no evidence that any of the directors were subject to influence or domination by Pennsylvania or by any of the individual defendants in these suits.

The way the settlement negotiations were carried on and approval arrived at is indicative of good faith on the part of the Pennroad representatives concerned. Serious and deliberate efforts were made to obtain the highest offer possible. The problem which faced the directors when they considered the offer of $15,000,000 was complex, and involved mainly questions which a lawyer could best decide. They sought the advice of Mr. Wolf whom they had previously retained as independent counsel. He had studied the Overfield-Weigle cases, understood the considerations to be evaluated, and was competent to advise the directors. It was reasonable for them to lean heavily upon his advice. The settlement agreement had the approval of Senator Hastings who spoke for himself and other lawyers who had directed the litigation against Pennsylvania for many years. In view of his knowledge of the subject, the position which he had so long maintained in the litigation, as well as his competency, it seems proper that his recommendation should have been regarded seriously by the board.

The foregoing matters have been set forth, in perhaps tedious detail, by reason of the prime importance of the question of good faith of the directors. From the evidence, I conclude and find that in entering into the settlement the directors were free from disqualifying interests, and that they acted in good faith. With that finding, there is no need to inquire into the merits of the settlement. *Karasik v. Pacific Eastern Corp.,* 21 *Del.Ch.* 81, 180 *A.* 604; *Winkelman v. General Motors Corporation,* (*D.C.,*) 48 *F.Supp.* 490;

*McLaughlin, Termination of Stockholder's Suit*, (1936) 46 *Yale L.J.* 421. This is but an application of the general rule expressed in *Section* 9 of the *Delaware Corporation Law, Rev.Code of Del.* 1935, § 2041, thus:

"The business of every corporation * * * shall be managed by a Board of Directors * * *."

The ruling in no wise conflicts with what was said generally with respect to a court's consideration of settlements, in the case of *In re Ortiz' Estate*, 26 *Del.Ch.* 240, 27 *A.2d* 368. That opinion does not purport to determine or discuss the effect of a finding of good faith on the part of directors who sponsor a settlement of a stockholders' suit.

Good faith may, nevertheless, be impugned by a showing that the settlement is so unfair and grossly inadequate, from the standpoint of the corporation, as to impel the conclusion that it emanates from acts of bad faith, or a reckless indifference to the rights of others interested, rather than a reasonable exercise of business judgment. *Karasik v. Pacific Eastern Corp., supra; Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 14 *Del.Ch.* 1, 120 *A.* 486; *Cole v. National Cash Credit Ass'n.*, 18 *Del.Ch.* 47, 156 *A.* 183; *Porges v. Vadsco Sales Corporation*, 27 *Del.Ch.* 127, 32 *A.2d* 148. The objectants contend that the amount of the settlement, $15,000,000, is grossly inadequate. They argue that the only judges who considered the merits in the Overfield-Weigle actions concluded that Pennroad should recover against Pennsylvania; that Judge Welsh's rule of damages "has no foundation in the settled law of * * * [Pennsylvania] or of any other jurisdiction in the United States," but that Judge Biggs' rule of damages was eminently proper and would result in a large sum estimated at about $200,000,000; that "there is absolutely no justification whatsoever for a court of equity to approve this settlement."

In the petition, it is stated that the chief reason for the board's approval of the agreement is the uncertainty of the outcome of the litigation. Another reason given is that

a final determination would require an indefinite length of time. It is alleged that the board was influenced by the very substantial amount of the settlement, and a consideration of the possible profits which the corporation might make by the use of this money. In this connection, the two following quotations from briefs of the objectants fairly summarize their position:

"Litigation, we concede, is never certain, but we submit that the litigation involved here is as certain as any litigation could ever be."

"* * * the reasonable doubts existing in the Perrine suit are not such as to discourage of preclude the reasonable possibility of proceeding to a fair judgment."

The reasonable doubts and possibilities referred to are not susceptible of precise reduction to a numerical ratio by any method of which I am aware. The court is not called upon to make an appraisal in the nature of an advisory opinion. Compare: *In re Midland United Co.*, (*D.C.*) 58 *F.Supp.* 667, 681. However, the long history of the litigation, the magnitude of the offer in settlement (particularly when compared with the amount of the only damages awarded by any judgment in favor of Pennroad on the basic claims), the testimony of the learned solicitors, Mr. Wolf and Senator Hastings—all viewed in the factual setting of the record before me—furnish full warrant for the conclusion that the acceptance of the offer was within the reasonable exercise of business judgment and did not assail the good faith of the directors.

Numerous contentions of the objectants I have deemed not to merit special mention. They have, nevertheless, been considered and determined in harmony with what has been said and with the end result reached.

The settlement agreement should be approved and the petitioner authorized to carry it out.

An order accordingly will be advised.

Note. Affirmed on appeal in behalf of certain objectors in an opinion to be reported in 29 *Dela. Ch. Reps.*, 47 *A.* 2d 479.