DR. MAX BRAUN, a stockholder of Fleming-Hall Tobacco Co., Inc., a corporation of the State of Delaware,
Appellant,

vs.

FLEMING-HALL TOBACCO Co., INC., a corporation of the State of Delaware, and SOL C. KORN,
Appellees.

*Supreme Court, On Appeal, November 4, 1952.*

SOUTHERLAND, Chief Justice, and WOLCOTT and TUNNELL, Justices, sitting.

*Russell J. Willard, Jr.*, of Hastings, Stockly, & Walz, for appellant Max Braun.

*John Van Brunt, Jr.*, of Killoran & Van Brunt, for Herbert W. Salus, Jr., the plaintiff-below.

*Edwin D. Steel, Jr.*, of Morris, Steel, Nichols & Arsht, for Fleming-Hall Tobacco Co., Inc., defendant-below, appellee.

*David F. Anderson*, of Berl, Potter & Anderson, for Sol C. Korn, defendant-below, appellee.

TUNNELL, Justice, delivering the opinion of the court:

Fleming-Hall Tobacco Co., Inc., a corporation, hereinafter called "Fleming-Hall", was organized under the laws of the State of Delaware in 1945.

From the time of Fleming-Hall's origin one Sol C. Korn, hereinafter called "Korn", has been its president. Since 1947 Korn's salary has been $2500 per month, plus expenses. The most recent employment contract with Korn retains his services to the company at the above-stated salary for a further period of five years, beginning on January 1, 1950.

Fleming-Hall, as the major feature of its general business of manufacturing and selling tobacco products, has heretofore manufactured and sold two brands of cigarettes called "Sano" and "Encore", respectively. These brands are little known to the public, and since the company was unable to afford a program of national advertising, these products could only be sold in volume by inducing various retail establishments to place them prominently on display. In the tobacco trade generally, and with this company in particular, this inducement to display certain products preferentially was effected by appeals directly to the persons in

control of various retail outlets, and commonly took the form of giving such individuals handsome presents or entertaining them lavishly at the expense of the company.

During the years since 1945 Korn has, for various such expenses for gifts and entertainment, and for his own travel, received large sums of money, the exact amounts thereof, however, being a matter of dispute. No vouchers or invoices were required in respect to any of these sums so paid to Korn from time to time, and no method was employed which would record any particulars as to the said money, such as on whom, when, where, or for what, it was spent. Korn would testify,[1] however, that he spent all these monies for company purposes, and the total expenses of Fleming-Hall for promotion and advertising has borne approximately the same relation to its volume of sales as is the case with a number of Fleming-Hall's competitors.

The company has always suffered financial difficulty. It lost money every year except in 1949, when the profit it made was, however, of little consequence when compared with the losses before and after 1949.

In 1948, purportedly in an effort to retain its personnel in the face of an unpromising future, the corporation extended to Korn and a number of other individuals affiliated with the company as directors, officers, or employees, options for the purchase of 135,000 shares of the common stock of the said corporation. The options were to purchase the said stock at $1.00 per share. In 1948 the market price of the stock was from 50¢ to 60¢ per share. The option plan provided for subscribing for the stock by a down-payment of one cent per share, and by the giving of notes to the company representing the balance of the purchase price. The shares so subscribed for under the plan were to be held by the company as collateral for the payment of the notes, but the personal credit of the optionees was not bound for the payment thereof.

---

[1] Statements here and hereafter as to the testimony which certain persons would give are based upon the unchallenged representations which counsel made to the Court of Chancery at the hearing of Nov. 20th, 1951, which will be referred to later in this opinion.

Pursuant to the above option plan, Korn, on the 15th day of October, 1948, entered into an agreement securing to himself an option to purchase 80,000 shares, and he ultimately took over either the options of other persons for 12,500 additional shares or that number of actual shares subscribed for by others under the plan. Of the remaining 42,500 shares, 31,000 were purchased by members of the board of directors and 11,500 by employees who were not on the board.

In July of 1950 the company offered to all of its stockholders an option to purchase 79,414 shares of authorized but unissued capital stock of the corporation at $1.25 per share. After the said offer to stockholders had remained open for two months without any person availing himself thereof, Korn, on August 31, 1950, offered to subscribe for any of the said 79,414 shares which others would not take up within the period during which the company's offer to stockholders was limited. In due course, on February 2nd, 1951, promptly upon the expiration of the term of the public offering, the company accepted Korn's offer and permitted him to subscribe for the residue of the lot of stock, being 62,364 shares, taking from him a payment of one cent per share, and taking his note for the balance of the purchase price.

All options above mentioned were exercised before the 9th day of March, 1951 and the transfer agent had at that time duly issued certificates of stock for the same, stamping each certificate so as to indicate that the shares were only partially paid.

On March 22, 1951, after at least a month of preliminary negotiation,[2] Fleming-Hall entered into a contract with United States Tobacco Company to sell to the latter corporation substantially all of Fleming-Hall's assets for the sum of $4,325,000, subject to certain minor adjustments in the price at settlement.

On the 8th day of June, 1951, and on the 20th day of June, 1951, one Herbert W. Salus, Jr., a beneficial owner of certain shares of the common stock of Fleming-Hall, instituted two separate derivative actions in the Delaware Court of Chancery, both suits

---

[2] But the president of the United States Tobacco Company would testify that the negotiations for this sale did not commence until after Feb. 2, 1951.

naming Fleming-Hall as the nominal defendant and Korn as the real defendant. In the first suit it was sought to bring Korn into court under the provisions of *Para.* 4374, *Revised Code of Delaware*, 1935. In the second suit personal service upon Korn was obtained.

On the 20th day of June, 1951, the stockholders voted approval of a proposal to dissolve the company and distribute its assets to the shareholders. Thereafter a first liquidating dividend of $1.00 per share was paid on the common stock.

On the 12th day of September, 1951, a third derivative action was filed by the same plaintiff against the same two defendants, but also against fifteen non-residents[3] of the State of Delaware as additional co-defendants. These fifteen individuals were alleged to have served as directors or officers of Fleming-Hall or to have been affiliated with the company in some other connection as employees or favored customers, and were alleged to be the persons who, along with Korn, had acquired stock in the company as a result of the above-described 1948 stock option plan. No personal service was obtained on any of these fifteen additional defendants, and jurisdiction over them is predicated solely upon *Para.* 4374, *Revised Code of Delaware*, 1935.

Since all three of the said suits involve common issues of fact and law, pursuant to a stipulation of counsel under *Rule* 42(a) of the Court of Chancery, on the 16th day of October, 1951, the Chancellor entered an order consolidating the three actions into a single proceeding.

Taking in the aggregate all of the allegations of the three complaints, it appears that there were three specific charges of irregularities.

In respect to the 1950 option, the complaints allege that Korn purchased his 62,364 shares only after he had "acquired knowledge of the willingness of the United States Tobacco Company to negotiate for the purchase of substantially all the assets of the corporate defendant." It is averred, further, that Korn bought the stock only for the purpose of "increasing his participation in the liquidation" of the corporate defendant and for the

---

[3] Having residence in five different states.

purpose of unjustly enriching himself at the expense of the minority stockholders of the corporate defendant, all in violation of his fiduciary obligations.

In respect to the stock options of 1948, the complaints allege, (a) that the purported subscriptions of all sixteen individual defendants are irregular and void as being in violation of *Para.* 2068, *Revised Code of Delaware*, 1935, forbidding a corporation to lend money to its officers, and (b), that "the said subscriptions, in practical effect," were without consideration. In respect to these shares the complaints also allege the same improper motive and breach of fiduciary duty charged against Korn alone in respect to the 1950 option.

Finally, the complaints charge that Korn simply used the above-described "expense account" system as a device for dishonestly lining his own pockets, and that he actually retained large sums of these monies as his own. An accounting from Korn is, therefore, demanded.

Before the causes came on for trial in the Court of Chancery, however, counsel for the plaintiff, for Fleming-Hall, and for Korn, agreed upon a compromise settlement. The said compromise was reduced to a formal agreement, the essence of which was as follows:

1. Korn was to surrender for cancellation the entire lot of 62,364 shares he had purchased as a result of the 1950 option plan, taking in exchange therefor the sum of 25¢ per share, which, together with the $1.00 per share he had already received as a liquidating dividend, would refund to him the price of $1.25 he had paid the company for each of those particular shares.

2. Korn was to surrender for cancellation 57,636 of the shares he had purchased as a result of the 1948 option plan. Since he had paid $1.00 for each of those shares and had received $1.00 as a liquidating dividend, no money was to pass at settlement in relation to this item.

3. Korn was to have his salary reduced for the three months, October–December, 1951, from $2500 per month to $1500 per month. All salary payments to Korn were to cease as of Dec. 31, 1951.

4. As of Oct. 1, 1951, Korn was to cease drawing any reimbursement for expenses.

5. Korn was to release Fleming-Hall from his employment contract, which, as above noted, under its terms did not expire until Dec. 31. 1954.

6. Korn was to pay his own costs, expenses, and counsel fees in connection with the instant litigation.

7. Fleming-Hall was to release all defendants from all liability in connection with the matters specifically charged in the three complaints.

8. The suits were to be dismissed with prejudice.

Upon entering into the said compromise agreement, the parties petitioned the Court of Chancery to approve the terms thereof, and, in preparation for the hearing, all stockholders of Fleming-Hall were formally notified to appear in the Court of Chancery in Wilmington on the 20th day of November, 1951, to show cause, if any they might have, why the said compromise agreement should not be approved.

At the said hearing full statements were made to the Chancellor by counsel, and plaintiff's counsel laid before the Chancellor an exposition of his views as to the strong points and weaknesses of the plaintiff's case, with detailed references to problems of proof. He reviewed for the court the highlights of the five oral depositions he had taken and described the result of his having called for and examined a mass of documentary evidence in preparation for trial. All the aforementioned counsel gave to the court their reasons for considering the settlement a fair one and requesting the court to approve it.

The only stockholder of Fleming-Hall who appeared in response to the rule to show cause was one Max Braun. His counsel filed with the court written objections to the settlement, and the said written objections, as amplified by the oral statements of Braun's counsel at the hearing, may be summarized as follows:

1. The notice of the hearing was fatally defective, in that it failed to notify the stockholders that Korn was to receive a refund of 25¢ per share as a pre-requisite to cancelling 62,364 of his shares.

2. The case ought not to be settled without the Chancellor's taking detailed testimony.

3. Defendants are not entitled to a "general" release.

4. The proposed settlement is "inadequate", being "substantially less" than would be recoverable on a trial.

Before the close of the hearing, counsel for Braun was offered an opportunity to examine under oath Korn or the accountant for Fleming-Hall, or both. He did not avail himself of that opportunity, however, nor did he offer at that time to present any proof in support of his position, nor did he request leave thereafter to take the deposition of any witness or to take any other step designed toward controverting any claim, opinion, or recommendation of any of the attorneys who had agreed upon the settlement and urged it upon the court as sound and fair.

After all counsel had been heard, the Chancellor, without opinion, on November 23, 1951, entered an order approving the settlement.

Subsequently, on December 12, 1951, upon petition, the court entered an order making allowances to counsel for the plaintiff for professional services and expenses sustained in the cause.

On December 14, 1951, the Court of Chancery entered final judgment dismissing the complaints with prejudice. Counsel for Max Braun, who had not obtained an order granting him leave to intervene as a party, did not seek a stay. Accordingly, in conformity with the settlement agreement which the court had formally approved, the following steps were taken:

1. Korn surrendered the certificates for his 120,000 shares.

2. Korn was refunded his $15,591.00.

3. The 120,000 shares of stock were cancelled.

4. Counsel fees were allowed and paid.

5. Releases were executed and delivered in obedience to the terms of the settlement agreement.

On the 20th day of February, 1952, Max Braun filed with the clerk of this court the following praecipe:

"In The Supreme Court Of The State Of Delaware

Dr. Max Braun, a stockholder of Fleming-Hall Tobacco Co., Inc., a corporation of the State of Delaware,

Appellant.

Fleming-Hall Tobacco Co., Inc., a corporation of the State of Delaware, and SOL C. KORN,

Appellees

Appeal from the decree of the Chancellor dated December 12, 1951, granting the petition of Herbert W. Salus, Jr., a minority stockholder and Sol C. Korn, a majority stockholder, of the Fleming-Hall Tobacco Co., Inc., for approval of a compromise of actions 250, 252, 271, in the Court of Chancery of the State of Delaware, in and for New Castle County, in which Herbert W. Salus, Jr. was the complainant and Fleming-Hall Tobacco Co., Inc., et al., were defendants.

Please issue writ of appeal to the Court of Chancery of the State of Delaware in and for New Castle County, and citation for the Appellees.

Hastings, Stockly & Walz
By /s/ Russell J. Willard"

Upon the appellant's filing his brief and appendix in this cause, appellees, together with counsel for Salus, the original plaintiff-below, joined in a motion to dismiss the appeal. In support of the said motion to dismiss three grounds are uged, to each of which we must now direct our attention.

Appellees first argue that the appeal was not taken in time. Their motion correctly asserts that the order of December 12th, the date designated in the praecipe, was interlocutory in character. As we noted, it merely allowed fees and expenses to counsel. But, assuming a clerical error on the part of the appellant in stating the date, and turning to the language in the praecipe describing the order appealed from, our attention is directed to the order of November 23rd, for that was the date of the order which approved the compromise. And it, too, was clearly interlocutory, for it expressly retained jurisdiction in the Court of Chancery and laid the foundation for the interlocutory order and the final judgment which were still to follow.

Neither of the orders expressly designated in the praecipe being a final order, the appellees point to *Rule 2(2)* of this court, which provides as follows:

"Appeals From Interlocutory Decrees in Chancery. For the sole purpose of receiving appeals from interlocutory decrees or orders of the Court of Chancery in accordance with Section 5144 of the Revised Code of Delaware, 1935 (10 Del.C § 143), there shall be special monthly terms of the Supreme Court beginning on the first secular day of each month; provided that, if an interlocutory decree or order shall be entered in any month on or later than the twentieth day thereof, the time for filing such appeal shall be extended until the tenth day of such monthly term."

Appellees, therefore, conclude that this appeal, being from one or the other of these two above-described interlocutory orders, and having been taken on February 20th, 1952, was too late.

In making this argument, appellees are compelled, of course, to rely upon the descriptive matter appearing on the right-hand margin of the praecipe. That, however, they may not do.

*Rule* 5 of this court, effective on the 1st day of January, 1952, provided for the first time for a method of instituting appeals by "notices of appeal". The rule requires that these notices of appeal must "designate the decree, judgment, or order, or part thereof, sought to be reviewed", and in so doing the rule established an innovation, for the praecipe, by which appeals had always theretofore been instituted, contained no information whatever except the caption of the case and a demand for a writ. The effect of the praecipe was to bring up the entire record for review. Upon arrival of the record in court, it was possible for the plaintiff-in-error, if he had properly reserved his rights below, to rely upon any material error or errors which he conceived that record to contain.

■ The method of appealing by notice of appeal, however, is only provided as an alternative; nothing in the rule attempts[4] to make any alteration in the traditional mode of taking appeals by praecipe. In writing upon his praecipe these references which, if followed, would limit the court's attention to one or the other of two particular orders which were only interlocutory in character, and would, therefore, force the dismissal of this appeal, counsel for the appellant actually supplied only surplusage. Since it is only surplusage, we do not consider it proper to dismiss the appeal by

[4] The rule has now been amended, however, effective November 1, 1952, requiring the praecipe to contain the same information heretofore required in a notice of appeal.

reason of what it, and it only, contains. 41 *Am.Jur.*, *p.* 323–324; *Bartoshesky v. Houston Trading Corp.*, 9 *W.W.Harr.* (39 *Del.*) 310, 319, 198 *A.* 697. We elect to read upon the praecipe only that matter which was properly put upon it. So far as that matter is concerned, it is in conformity with the ancient practice in this court and calls up the entire record for review.

■ We conclude on that point, therefore, that since the appellant has alleged error in the final judgment, and since the statutes of our state, *Para.* 5146, *Revised Code of Delaware*, 1935, allow six months for review of a final judgment, the appeal was timely.

■ Appellees next urge dismissal of the appeal on the ground that the appellant, Braun, is not a proper party in this court because he was not a "party" to the proceeding below.

It is, of course, and always has been, the practice for persons in the situation of Braun to ask leave to intervene in the proceedings before the trial court. But he was under a rule to appear before the Court of Chancery if he considered his interests in jeopardy; and it was pursuant to that rule that his counsel filed written objections to the settlement and made oral argument against the approval thereof. Nobody objected to either of these activities in the trial court. What took place, therefore, amounted to actual intervention, even though it was without express leave of court. If counsel for Braun below had asked to intervene, an order granting leave would undoubtedly have been entered. In these circumstances, therefore, we do not regard the failure to ask permission to intervene as any more than the oversight of a formality.

The doctrine we here affirm is not novel and, in fact, finds a parallel in this very appeal. It will be observed that the praecipe, which we quoted at length, failed to join as an appellee the plaintiff in the suit below. The writ, of course, followed the praecipe. Instead of moving to dismiss the appeal for want of an indispensable party, however, the appellees elected to move for dismissal on other grounds, and counsel for the plaintiff-below not only joined in the said motion to dismiss, but participated in the brief. Moreover, at the oral argument on the merits, counsel for plaintiff-below

made argument in behalf of those appellees who were technical parties, as well as in behalf of his own client. Certainly the whole course of conduct of plaintiff-below, taken together with the tacit concurrence of all parties, leads to the conclusion that the plaintiff-below is now in court.

We decline, therefore, on similar grounds, to hold that appellant is not a proper party to this proceeding.

■ Finally, counsel for appellees urge the dismissal of this appeal on the ground that the case is moot, because, since the Court of Chancery entered its final decree on December 14, 1951, everything has been done which the plaintiff sought by his action to prevent. They rely upon the well established doctrine that when it is too late for any remedy to be afforded, the court has neither the right nor the duty, for merely academic purposes, to expound the law of the transaction. *Southern Production Co. v. Sabath, Del.*, 87 *A.2d* 128; 14 *Am.Jur., pp.* 277–278.

It is, of course, true that the actions which the original complaints sought to enjoin have now, in a form modified by compromise, either been consummated or committed to consummation by a settlement contract, which, so far as Korn is concerned, is fully executed. But appellees have conducted their whole attack upon the premise that the only remedies to be considered are those which are exclusively the prerogatives of courts of equity. No consideration has been given to the possibility of monetary relief. If this settlement between the corporation and Korn was improper, might it not be urged that the stockholders are entitled to be afforded the only sort of remedy which is any longer practicable, that is, a judgment for damages to their stock? *Martin v. American Potash & Chemical Corporation, Del.*, 92 *A.2d* 295; *Fletcher, Cyclopedia Corporations (Perm.Ed.) Secs.* 1282, 1283.

On this point, however, we decide nothing and merely state a query. We are in the unsatisfactory situation where the appellees, understandably, have not dwelt upon a phase of the problem unfavorable to their motion; and the appellant, on the other hand, has filed no brief in respect to any aspect of the motion to dismiss, and was unable at the argument to give the court any material assistance on this question.

If a decision on this point were essential to a fair disposition of the case, we should be compelled to require something more than this incomplete presentation. In the precise circumstances before us, however, there is available an alternative which involves no delay.

If this case, as it stands before us, is one properly to be regarded as moot, then the appeal should be dismissed, and the appellees would, of course, prevail. On the other hand, if it is not moot, and the case must be decided on its merits, we perceive that the appellees must also prevail, and the ultimate result is the same. Accordingly, we pass by this question of mootness and turn to the merits.

In this court Braun has asserted the same grounds of objection to the settlement which he interposed below, so we find it convenient to treat the principal case by considering Braun's various objections *seriatim*.

■■ His objection to the sufficiency of the notice, in failing to call attention to an item of restitution to Korn, is without merit. The notice is clearly adequate. It is too long to be copied into this opinion, and we think it is unnecessary to discuss its components. Suffice it to say that it contained a fair description of the proposed settlement, more than enough to put stockholders upon notice as to the general nature of the subject-matter, and to warn them that their substantial interests were involved. The notice was not required to eliminate all occasion for initiative and diligence on the part of the stockholders. *Perrine v. Pennroad Corp.*, 28 *Del.Ch.* 342, 351, 43 *A.2d* 721. Any interested party could easily obtain all the details of the terms by examining the file in the Court of Chancery. And, in any case, since the notice advised that there was to be rescission, it should have been suspected that restitution would be involved. 12 *Am.Jur.*, *p.* 1031.

■ Braun's objection to having the case settled without the Chancellor's having actually heard the testimony is based upon a failure to appreciate the essential purpose of a settlement. One of the considerations which anciently caused the law to favor objects designed to put an end to litigation was the saving of

time, expense, and inconvenience incident to trials. If court approval of a settlement necessarily involved a rehearsal of the trial, settlements would be deprived of their principal virtue. Vice Chancellor Pearson held that a hearing of the testimony is not necessary to support approval of a settlement and gave us a summary of the considerations by which a court is to be governed in such proceedings. *In re Ortiz's Estate*, 26 *Del.Ch.* 240, 253–254, 27 *A.2d* 368, approved by this court in *Perrine v. Pennroad Corp.*, 29 *Del.Ch.* 531, 550, 47 *A.2d* 479. There is no necessity for us here to reiterate what has already been so well stated.

In hearing the summaries and recommendations of all counsel, including counsel for Braun, and in affording counsel for Braun a full opportunity, without undue stress of time, to introduce into evidence any facts which he conceived might throw substantial doubt upon the sufficiency of the settlement, the Court of Chancery did all that was required. Since Braun's counsel did nothing to take advantage of that opportunity, it would have been an unwarranted imposition upon all other parties if the Chancellor had acceded to the demand that he require what would be tantamount to the very trial which this settlement was designed to avoid.

The objection to having the defendants receive a general release is founded upon a misapprehension of fact. A glance back to our summary of the settlement agreement will establish that no general release was contemplated or given.

Braun's final objection is that in the settlement the corporation's concessions vastly outweighed what it received.

The judgment of the Court of Chancery as to the adequacy of the settlement was an exercise of judicial discretion. For appellant to prevail on this point, therefore, the alleged disparity between the two sides of the bargain must be such as to establish abuse of discretion. The appellant has, however, fallen so far short of that requirement as to release us from the necessity of discussing the subject at any considerable length.

As to the accounting question, it is difficult to see how the plaintiff could seriously have hoped to recover any substantial sum of money. How could plaintiff expect effectively to overcome

the testimony which Korn would give that he spent all the money for company purposes? No affirmative proof of misappropriation has been suggested. The proof that the relation of Fleming-Hall's total expenses for promotion and advertising to the company's volume of sales was not out of line with the experience of a number of Fleming-Hall's competitors would have been a serious obstacle to plaintiff's success. Despite this weak case in the plaintiff on the question of money, nevertheless, in consideration of the settlement, Korn has diminished his salary, cancelled his employment contract, and foregone any legitimate advantage a traveling man might derive from the right to support himself for a portion of his time out of his employer's funds.

As to the matter of the stock subjected to the 1948 option plan, 57,636 shares of the 135,000 are being cancelled. Of the remaining 77,364, 11,500 shares were acquired by non-directors, and it is difficult to see how the acquisition of these shares could be seriously attacked. As to the whole 42,500 shares in the hands of the individual defendants, there was, moreover, the additional difficulty of either bringing suits in numerous foreign jurisdictions or waiting five years for an effective judgment in Delaware, *Para.* 4376, *Revised Code of Delaware*, 1935. In view of the concession made to plaintiff, it, therefore, appears unnecessary here to take the space to discuss the importance of *Para.* 2068, *Revised Code of Delaware*, 1935, or the question of the sufficiency of consideration for these options.

In respect to the 62,364 shares Korn acquired under the 1951 option plan, it appears that in the settlement the corporation derived a very real advantage which must be set off against any supposed weakness in the settlement relating to either of the preceding two items. Without proving that these 62,364 shares were acquired because of inside information of the impending sale to the United States Tobacco Co., there would be no ground for cancellation. The testimony of the president of the United States Tobacco Company, who, so far as appears, is completely disinterested in this litigation, that on February 2nd, the day Korn subscribed for the stock, there had as yet been absolutely no negotiation for the sale, would probably have been a great factor in Korn's favor in the event of a trial.

■ Viewing the settlement as a whole, it is evident that there is no warrant whatever for contending that it would shock the conscience of a court. On the contrary, though we do not need to say so, we do not hesitate to say that if we had been in the Chancellor's place, we should have done as he did.

The judgment of the Court of Chancery will be affirmed.