In re TD BANKNORTH Shareholders Litigation.

C.A. No. 2557–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: June 27, 2007.
Decided: July 19, 2007.

Norman M. Monhait, Esquire, Rosenthal, Monhait & Goddess, P.A. Wilmington, Delaware; Seth D. Rigrodsky, Esquire, Rigrodsky & Long, P.A., Wilmington, Delaware; Richard B. Brualdi, The Brualdi Law Firm, P.C., New York, New York; James S. Notis, Esquire, Gardy & Notis, LLP, Englewood Cliffs, New Jersey; Shane T. Rowley, Esquire, Faruqi & Faruqi, LLP, New York, New York; Harold B. Obstfeld, Esquire, Harold B. Obstfeld, P.C., New York, New York; Robert M. Kornreich, Esquire, Chet B. Waldman, Esquire, Anthony D. Green, Esquire, Wolf Popper LLP, New York, New York, Attorneys for the Plaintiffs.

Anne C. Foster, Esquire, John D. Hendershot, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael J. Chepiga, Esquire, Lynn K. Neuner, Esquire, Elaine M. Divelbliss, Esquire, Leah R. Threatte, Esquire, Simpson, Thacher & Bartlett, LLP, New York, New York, Attorneys for The Toronto–Dominion Bank, William J. Ryan, William E. Bennett, W. Edmund Clark, Bharat Masrani, and Wilbur J. Prezzano.

Robert K. Payson, Esquire, Bradley W. Voss, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware; Paul K. Rowe, Esquire, William K. Savitt, Esquire, Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Robert G. Clarke, P. Kevin Condron, John O. Drew, Brian M. Flynn, Joanna T. Lau, Dana S. Levenson, Steven T. Martin, John M. Naughton, Irving E. Rogers, David A. Rosow, Curtis M. Scribner, Peter G. Vigue and Gerry S. Weidema.

M. Duncan Grant, Esquire, Edmond D. Johnson, Esquire, Pepper Hamilton, LLP, Wilmington, Delaware, Attorneys for TD Banknorth, Inc.

Michael Hanrahan, Esquire, Paul A. Fioravanti, Jr., Esquire, Laina M. Herbert, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Samuel H. Rudman, Esquire, Robert M. Rothman, Esquire, Evan J. Kaufman, Esquire, Mark S. Reich, Esquire, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, Melville, New York; Kevin Fitzgerald, Esquire, Jennifer L. Frank, Esquire, Lewis Saul & Associates, P.A., Portland, Maine, Attorneys for the Objectors.

### OPINION

LAMB, Vice Chancellor.

This is a class action litigation arising from the recent $3.19 billion merger by which The Toronto–Dominion Bank acquired the remaining publicly traded

shares of TD Banknorth, Inc. Before the court is a proposal to settle providing that, in exchange for releasing the defendants from any potential liability in connection with the merger, the class has received or will receive: (i) $0.03 per share in monetary consideration;[1] (ii) the exclusion from the majority-of-the-minority vote calculation of approximately 11,500 shares out of over 97 million eligible shares outstanding at the time the transaction closed;[2] and (iii) the inclusion of supplemental disclosures in the final proxy statement.[3] Additionally, plaintiffs' counsel seek $1,045,000 in costs and fees for their work in this case.

Several Banknorth stockholders have come forward—initially as intervenors, but now as formal objectors—to challenge the settlement. One of the objectors litigated a parallel proceeding against these same defendants in a Maine state court in the early months of 2007. The objectors contend that the settlement relinquishes viable contractual and entire fairness claims in return for insubstantial consideration for the class, and urge the court to reject the settlement on that basis.

 The review procedure employed at this time requires the court to decide whether, in the exercise of its own business judgment and in light of the facts and circumstances presented, the proposed settlement is a fair and reasonable resolution to this litigation.[4] Based on the record submitted, and aware of its duty to not become a fact-finder in the present context,[5] the court concludes that the plaintiffs unreasonably failed to press legitimate legal claims against the defendants before consenting to the settlement. As a result, the class members appear to have received

---

1. The settlement fund is approximately $3 million, and the $0.03 per share increase constitutes a less than one-tenth of one percent increase in the merger price of $32.33 per share. These funds are payable not only to Banknorth's former minority stockholders, but to the individual defendants and their affiliates as well.

2. These 11,596 shares were held by Wendy Suehrstedt and Peter Verrill, two of the company's non-director officers.

3. These disclosures included comments concerning: (i) Banknorth's January 24, 2007 announcement to analysts discussing the company's improving future prospects; (ii) valuation metrics and financial materials used by the company's investment banker in rendering a fairness opinion, as well as issues related to the banker's independence; (iii) a letter from an institutional investor to the Banknorth board raising concerns about the appointment of a new CEO in the fall of 2006; and (iv) the merger parties' beliefs that both a higher and a lower price than the one ultimately negotiated would fall within a range of reasonableness.

4. *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1045 (Del.1996); *Polk v. Good*, 507 A.2d 531, 536 (Del.1986); *Geller v. Tabas*, 462 A.2d 1078, 1082 (Del.1983). This legal standard for approval of a class action settlement is well-established in Delaware law and embodies the notion that courts of this state generally favor the voluntary resolution of legal disputes. *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del.1989). In the end, an evaluation of whether a settlement is fair and reasonable requires balancing the strengths of the claims being compromised against the benefits the settlement provides to the class members. *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1284–85 (Del.1989). The settlement's proponents bear the burden of persuasion by a preponderance of the evidence. *In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *9 (Del.Ch. Jun.7, 1990).

5. *Khoury v. Oppenheimer*, 1983 WL 8945, at *3 (Del.Ch. Nov.9, 1983). Although a reviewing court does not definitively determine whether potential claims ultimately have merit, it must still be vigilant in reviewing class action settlements due to the fiduciary obligations representative plaintiffs owe to fellow class members. *Polk*, 507 A.2d at 536; *Geller*, 462 A.2d at 1082.

insufficient consideration in the form of a token cash increase in the merger price, a virtually meaningless change in the calculation of the vote, and several proxy disclosures for which the plaintiffs cannot even wholly claim credit.

Before the court discusses the reasons why it must deny this settlement proposal, a background discussion of the factual record is appropriate.

## I.

### A. *The Parties*

The representative plaintiffs in this case are six former stockholders of the nominal defendant, TD Banknorth, Inc. Banknorth is a Delaware corporation and serves as the financial holding company for TD Banknorth, N.A., an entity which provides banking and financial advisory services throughout New England. The other corporate defendant, The Toronto–Dominion Bank, is a Canadian company with headquarters in Toronto, Ontario, Canada.

The individual defendants are various officers and directors of Banknorth. In addition to sitting on Banknorth's board during the relevant time period, defendants W. Edmund Clark,[6] Wilbur J. Prezzano, William E. Bennett, and William J. Ryan[7] simultaneously served on Toronto–Dominion's board of directors. Defendant Bharat B. Masrani is a Toronto–Dominion officer who was installed as president of Banknorth in September 2006 and as CEO in March 2007.

In addition to their seats on Banknorth's board, defendants P. Kevin Condron, Robert G. Clarke, Dana S. Levenson, and Cur-

tis M. Scribner were all members of the company's committee of independent directors (the "Special Committee"), and had intimate involvement in the transaction which precipitated this litigation. Condron served as chair of the Special Committee.[8]

### B. *The Facts*

#### 1. *Toronto–Dominion's Acquisition Of Banknorth*

On March 1, 2005, Toronto–Dominion acquired, directly from Banknorth, a 51% ownership interest in the company for approximately $3.8 billion in cash and stock, or the equivalent of $42.23 per Banknorth share. In connection with this change of control, Toronto–Dominion and Banknorth executed a stockholders' agreement that placed certain procedural restrictions on Toronto–Dominion's ability to initiate or effectuate a transaction with Banknorth that would result in Toronto–Dominion acquiring more than 66.7% of Banknorth's publicly held stock. Section 2.2 of that contract provides, in pertinent part:

(b) Prior to [March 1, 2007], [Toronto–Dominion] shall not . . . propose or initiate any Going Private Transaction unless invited to do so by a majority of the [Special Committee]. Any Going Private Transaction effected during this period shall also be subject to the requirements of Section 2.2(c).

(c) From [March 1, 2007] until [March 1, 2010]:(i) [Toronto–Dominion] may initiate and hold discussions regarding a Going Private Transaction with the Board on a confidential basis that would not

---

6. Clark serves as Toronto–Dominion's president and chief executive officer.

7. Ryan was chairman, president, and chief executive officer of Banknorth from July 1989 until he was replaced as president in September 2006 and as CEO in March 2007.

8. The remaining defendants are Gary S. Weidema, Peter G. Vigue, David A. Rosow, John M. Naughton, Irving E. Rogers, John O. Drew, Brian M. Flynn, Joanna T. Lau, and Steven T. Martin. Each sat on the Banknorth board.

reasonably be expected to require either [Banknorth or Toronto–Dominion] to make any public disclosure thereof [as required by applicable securities laws].... If a majority of the [Special Committee] approves such a transaction, [Toronto–Dominion] may publicly announce, commence and effect such Going Private Transaction....

(d) From and after [March 1, 2010], [Toronto–Dominion] may propose, initiate or effect a Going Private Transaction, provided that such Going Private Transaction is either approved by a majority of the [Special Committee] or by Unaffiliated Stockholder Approval and further provided that [Toronto–Dominion] shall not propose, publicly announce or initiate a Going Private Transaction ... without providing prior notice to the [Special Committee] and offering to first discuss and negotiate confidentially the terms [of] such proposed Going Private Transaction with the [Special Committee]....

After gaining majority control, Toronto–Dominion used Banknorth to acquire several U.S. financial institutions. On January 31, 2006, Banknorth purchased Hudson United Bancorp, and several months later agreed to acquire Interchange Financial Services Corporation. A substantial portion of the financing for both of these transactions came from Banknorth's sale of additional shares of its common stock to Toronto–Dominion.[9]

### 2. Discussions Begin On Taking Banknorth Private

At a December 8, 2005 meeting, Toronto–Dominion's board of directors discussed purchasing the remaining Banknorth stock. On January 23, 2006, Clark, Ryan, Masrani, Peter Verrill (vice chairman and chief operating officer of Banknorth), and two other Toronto–Dominion representatives attended a meeting of Banknorth's Strategic Planning Committee where an investment banker presented information on the company's strategic alternatives. The following day, Verrill met with the Special Committee. Discussions centered around a possible going private transaction, and included a presentation of comparable transaction and valuation analyses. The Special Committee determined that Condron should study "how a process would work in the event that the [Special Committee] was interested in inviting [Toronto–Dominion] to consider purchasing the minority interest."[10]

On April 13, 2006, Condron wrote his fellow committee members regarding discussions he had with John Hartley (the former chair of AXA Equitable, Inc.'s committee of independent directors), and enclosed a memorandum discussing the committee members' responsibilities. Condron suggested a meeting in May or early June to retain financial and legal advisors. Just two days later, at Ryan's request, Ryan and Condron privately met, with Ryan raising the issue of a potential going private transaction.

### 3. Toronto–Dominion Feels Pressure From Large Stockholders, And The Going Private Process Accelerates

In late April or early May 2006, a representative of Private Capital Management ("PCM"), an investor that owned approximately 7.6% of Banknorth's common stock, contacted Clark and Ryan to discuss the prospects of a privatizing transaction. PCM expressed dissatisfaction with its

---

**9.** As a result of these two deals, Toronto–Dominion's ownership of Banknorth increased to 59.5%.

**10.** Dep. of Curtis M. Scribner, Ex. 4.

Banknorth position and frustration at its inability to efficiently liquidate its holdings because of the downward pressure such a sale would put on Banknorth's stock price.

At a Special Committee meeting on May 8, 2006, Ryan, despite acknowledging the conflict he had due to his service on the boards of both Toronto–Dominion and Banknorth, "indicated that it might be timely for the [Special Committee] to consider having a discussion with [Toronto–Dominion] to discuss the potential for privatization." [11] Ryan also informed the Special Committee of Clark's recent discussions with PCM.

On May 9, 2006, the Banknorth board convened an executive session where Ryan "began a discussion of a potential going private transaction," including a potential price range.[12] Clark indicated Toronto–Dominion "might be interested in pursuing exploratory discussions if invited to do so by the [Special Committee]." [13] The boards of both Banknorth and Toronto–Dominion continued discussing the prospect of a transaction with their own constituents during the month of May.

On June 5, 2006, Clark called Condron to inquire about the Special Committee's progress in hiring advisors. Condron advised Clark that conversations between them "should be limited until [the Special Committee] had legal advisors in place." [14] The Special Committee soon retained Wachtell, Lipton, Rosen & Katz as its legal counsel and Sandler O'Neill as its financial advisor. Later that month, at a Special Committee meeting held on June 27, 2006, Condron reviewed "a recent conversation"

with Clark,[15] and financial advisors from Sandler presented a valuation analysis supporting a going private transaction.

### 4. *The Going Private Process Reaches A Climax*

From July to November 2006, Condron, on behalf of the Special Committee, and Clark, on behalf of Toronto–Dominion, engaged in a series of transactional negotiations. On July 21, 2006, Condron sent an email to the Special Committee reporting on a two-hour meeting with Clark. Apparently, Condron and Clark agreed that they would "negotiate" and "bargain together face to face" in the future, but Condron told Clark that the $30 to $32 per share price Clark mentioned to the Banknorth board was a "non-starter." [16] Five days later, Clark wrote to Condron attaching a financial analysis from Toronto–Dominion's advisor, Goldman Sachs, of a going private transaction priced at $30.50, and observed that "if we can come to an agreement," the transaction would need to be sold to the Banknorth stockholders.[17]

Throughout August and September 2006, Clark and Condron continued discussing the pricing of a potential transaction, with Clark stuck in the $30 to $32 range and Condron fluctuating in the $35 to $38 range. Both understood that Banknorth's future prospects for 2007, specifically the company's earnings estimates, would influence the tenor of their price discussions. Following a downward revision to Banknorth management's earning estimates in mid-September, Condron believed that $34 to $35 per share was an

---

11. Dep. of Robert G. Clarke, Ex. 6.

12. Dep. of Dana S. Levenson, Ex. 8.

13. Objectors' Ex. 8 at 22.

14. Dep. of P. Kevin Condron, Ex. 18.

15. Clarke Dep. Ex. 10.

16. Dep. of Bharat Masrani, Ex. 22 at 7. Objectors' Ex. 8 at 23–24.

17. Dep. of W. Edmund Clark, Ex. 25.

appropriate range to commence negotiations, while Clark stated that Toronto–Dominion would go no higher than $31 to $32. On September 27, 2006, Condron told Clark that it was in the best interests of Banknorth's minority stockholders to terminate negotiations.

It was not long before contacts resumed. In late October 2006, in connection with its financial report for the third fiscal quarter of 2006, Banknorth's management once again revised the company's earnings outlook downward. On November 6, 2006, based on these new numbers and on a revised valuation analysis prepared by Sandler, the Special Committee decided to resume discussions with Toronto–Dominion and instructed Condron to contact Clark. Clark responded on November 9 that Toronto–Dominion would consider a $31 per share all-cash transaction, or a $30.50 per share half-cash, half-stock deal. The Special Committee rejected these proposals, but instructed Condron to meet face-to-face with Clark. On November 15, 2006, after less than an hour of negotiations, Clark and Condron agreed upon a $32.33 per share all-cash transaction whereby Toronto–Dominion would acquire all the remaining common stock of Banknorth.

Three days later, Sandler made a presentation to the Special Committee in support of the $32.33 per share consideration. At that meeting, the Special Committee finally determined to issue an invitation to Toronto–Dominion to submit a proposal on the basis of a $32.33 per share cash price. Thus, no invitation under section 2.2(b) of the stockholders' agreement was issued by the Special Committee until November 18, 2006, after agreement on all material terms of the transaction.

That same afternoon, the Toronto–Dominion board met and approved the going private transaction. The next day, after hearing reports of the Special Committee and Sandler, the Banknorth board voted to approve the merger agreement and executed it. On November 20, 2006, Banknorth publicly announced the going private transaction.

5. *Multi–Jurisdictional Litigation Follows The Merger Announcement, The Delaware Plaintiffs Settle, And The Objectors Seek To Intervene*

On the heels of the November 20 announcement, six class action lawsuits were filed in the Court of Chancery on behalf of Banknorth's minority stockholders.[18] The court entered a consolidation order on November 29, 2006, appointing Gardy & Notis and The Brualdi Law Firm co-lead counsel. On November 28 and 30, 2006, two class actions challenging the merger were filed in New York state court, both of which were subsequently stayed pending the outcome of this litigation.[19] On December 8, 2006, Farmer, one of the objectors to this settlement, filed his own class action complaint in a state court in Maine.[20]

---

**18.** The six actions are: *Hutt v. TD Banknorth, Inc., et al.,* C.A. No. 2556–VCL (Del. Ch. filed Nov. 20, 2006); *Momentum Partners v. TD Banknorth, Inc., et al.,* C.A. No. 2557–VCL (Del. Ch. filed Nov. 20, 2006); *Goldstein v. TD Banknorth, Inc., et al.,* C.A. No. 2558–VCL (Del. Ch. filed Nov. 20, 2006); *Levy Investments Ltd. v. TD Banknorth, Inc., et al.,* C.A. No. 2560–VCL (Del. Ch. filed Nov. 20, 2006); *Society of the Supporters of the House of Sages v. TD Banknorth, Inc., et al.,* C.A. No. 2561–VCL(Del. Ch. filed Nov. 20, 2006); *Kahn v.* *TD Banknorth, Inc., et al.,* C.A. No. 2564–VCL (Del. Ch. filed Nov. 21, 2006).

**19.** *Wouk v. Ryan, et al.,* Case No. 06–117685 (N.Y. Sup.Ct. filed Nov. 28, 2006); *Alexander v. Ryan, et al.,* Case No. 06–117812 (N.Y. Sup.Ct. filed Nov. 30, 2006).

**20.** *Farmer v. TD Banknorth, Inc., et al.,* Docket No. CV–07–039 (Me. Sup.Ct. filed Dec. 8, 2006).

The plaintiffs served a document production request on December 14, 2006, but a week later agreed to extend the time for the defendants' response "indefinitely until ten business days following written notice from plaintiffs' counsel." [21] Banknorth filed a preliminary proxy statement and Schedule 13E–3 with the SEC on December 19, 2006, both of which documented the fairness materials Sandler presented to the Special Committee throughout the term of Sandler's engagement. The plaintiffs' counsel, with the assistance of its financial advisor, reviewed and analyzed these documents and the disclosures made in them.

Meanwhile, on January 29, 2007, Farmer's counsel requested a conference with the Maine court to discuss expedited discovery. After the Maine court scheduled a hearing on Farmer's motion for February 9, 2007, defendants' counsel and plaintiffs' counsel accelerated their settlement discussions. The plaintiffs filed their consolidated amended complaint in Delaware on February 6, and simultaneously sent a settlement proposal to the defendants. Pursuant to this proposal, and without having reviewed any documentary evidence that was not already publicly available, the plaintiffs offered to settle all of their claims for corrective disclosures, omitting any demand for monetary consideration.

Despite the plaintiffs' service of deposition notices in the interim period, the Maine court, in its February 9 hearing, ordered the defendants to produce documents, answer interrogatories, and schedule depositions in that action. The Maine court also scheduled another status confer-

ence for February 21. The Delaware plaintiffs then determined to make another effort at sweetening the settlement terms. On February 12, 2007, the plaintiffs demanded a $0.05 per share hike in the merger consideration, and the defendants ultimately agreed to a $0.03 increase. Then, on February 13, 2007—two days before a memorandum of understanding outlining the terms of the settlement was signed—Banknorth filed a revised proxy statement with additional disclosures.

Despite the pendency of the settlement, the Maine court allowed Farmer's counsel to take the depositions of nine key witnesses. Counsel for the plaintiffs' was present for these depositions, and the substance of the depositions formed a sizable portion of the plaintiffs' confirmatory discovery in Delaware. On March 8, 2007, only a day before the Maine court was to hear a motion by Farmer for injunctive relief and a motion by the defendants to dismiss or stay that case, Farmer and the defendants voluntarily stipulated to stay the Maine action.[22]

On March 21, 2007, the objectors filed a motion to intervene and to be appointed lead counsel in this action, as well as a motion to preliminarily enjoin the stockholder vote on the merger. Two days later, the plaintiffs and the defendants entered into a stipulation of settlement in the Delaware action. At oral argument on March 28, the court denied the objectors' motions, noting that no exigencies existed in this case which ought to disrupt the orderly procedure of requiring an intervenor to voice its concerns at the settlement hearing like a typical objector.[23]

---

21. Objectors' Ex. 14.

22. Farmer and the plaintiffs conducted two more depositions following the stay in the Maine action.

23. Tr. of Oral Arg. 49–50, Mar. 28, 2007. *See also In re Home Shopping Network, Inc. S'holder Litig.*, 1994 WL 560801, at *1 (Del. Ch. Oct.4, 1994) (deferring a motion to intervene until the settlement hearing); *Webcor Elecs. v. Whiting*, 101 F.R.D. 461, 465 (D.Del.

On April 18, 2007, Banknorth's stockholders overwhelmingly approved the merger, with nearly 95% of the shares not owned by Toronto–Dominion or its affiliates voting in favor of the transaction. Two days later, Banknorth went private, and the objectors filed an initial objection to the settlement. No other objectors came forward before the settlement hearing on June 27, 2007. However, all of the parties presently before the court submitted voluminous briefing on the relative merits of the settlement and the objection.

## II.

In urging the court to approve the settlement and their request for attorneys' fees and expenses, the plaintiffs claim that, prior to engaging in settlement discussions with the defendants, they undertook an extensive review of Banknorth's financial data and SEC filings disclosed in connection with the transaction, and consulted with a financial advisor who opined that the merger consideration fell squarely within the range of reasonableness. At the conclusion of their investigation, the plaintiffs believed that, in order to prevail on their entire fairness claim, they would shoulder the burden at trial of proving the transaction was not entirely fair.

Specifically, the plaintiffs say (and the defendants agree) that the transaction was the result of a lengthy, arms'-length bargaining process wherein completely disinterested directors—who possessed, and on one occasion exercised, the power to say "no"—exerted a great deal of leverage on the majority stockholder during negotiations. According to the plaintiffs, this objectively fair process, coupled with the Special Committee's reliance on its well-respected, independent legal and financial advisors, resulted in a merger price which was fair to the minority stockholders of Banknorth. The plaintiffs also note that the consummation of the transaction was contingent on a majority-of-the-minority voting requirement.

Moreover, the plaintiffs argue that they bargained hard with the defendants to protect the class's interests. The plaintiffs tout the fruits of their work—namely, monetary consideration and additional disclosures in the proxy materials—as proof that they extracted adequate consideration in return for the release of what they believe to be feeble legal claims.

Turning to the merits of the objection, the plaintiffs and the defendants focus on the objector's claim that the progression of the transaction was a clear violation of section 2.2(b) of the stockholders' agreement. First, the plaintiffs and the defendants argue that negotiations of the sort that occurred here throughout most of 2006 were not barred by section 2.2(b) of the stockholders' agreement because, according to them, Toronto–Dominion did not "initiate or propose" the transaction prior to the Special Committee's November 18, 2006 invitation. According to the plaintiffs and the defendants, in the context of a merger, the "initiation" or "proposal" of a transaction only occurs when a proposal is formally proffered for consideration by the board of directors, not when the parties enter into exploratory negotiations and discussions. To support this reading, they argue that section 2.2(b) was merely intended to prevent Toronto–Dominion from bypassing the Special Committee and making a public tender offer for the remaining shares of Banknorth, a situation which could result in a less-than-

1984) (refusing to rule on a motion to intervene until hearing the merits of the proposed settlement).

fair proposal on price. The defendants also contend that, even assuming a breach of section 2.2(b) occurred, the class suffered no quantifiable harm as a result, and because such a breach of contract claim is a derivative cause of action, the closing of the merger, in any event, precludes such a lawsuit now.

In response, the objectors generally argue that the settlement is unreasonable because it releases viable claims for paltry consideration. The crux of their objection lies in the purported violation of section 2.2(b), a claim which the objectors note the plaintiffs never asserted in the amended complaint. They believe a reasonable interpretation of that contractual provision prohibits the exact sequence of events that occurred in this case—namely, Toronto–Dominion's approach to Banknorth and the Special Committee to initiate negotiations and discussions regarding material terms of a going private transaction before the Special Committee invited such an approach. These acts, the objectors say, not only give rise to a strong breach of contract claim, but are also persuasive evidence of unfair dealing in an entire fairness analysis.[24]

The strength of the resulting legal claims, the objectors say, is clearly not reflected in the settlement terms. They label the $0.03 per share monetary consideration a pittance, and are dismissive of the exclusion of 11,500 shares from the roughly 97 million shares eligible to participate in the supermajority vote. The objectors also argue that the additional proxy disclosures purportedly included at the be-

hest of the plaintiffs cannot be seen as valid consideration because, among other reasons, these disclosures were included in an amended proxy statement that was publicly filed several days before the execution of the memorandum of understanding.

The objectors call further attention to potential shortcomings in the settlement notice mailed to the Banknorth stockholders. These shortcomings include the failure to attach to the notice an exhibit (identified as Exhibit A in the notice) listing the disclosures made as a result of the settlement, the omission of the fact that treating Suehrstedt and Verrill as Toronto–Dominion affiliates only resulted in the exclusion of about 11,500 shares from the majority-of-the-minority vote, and the failure to disclose that the individual defendants and their affiliates would participate in the $0.03 per share cash settlement fund.

### III.

A. *The Plaintiffs' Decision To Ignore Any Claims Based On A Violation Of The Stockholders' Agreement Was Unreasonable*

■ In evaluating a potential breach of section 2.2(b), a reviewing court should give the terms of that section their literal and ordinary meaning.[25] To repeat, the language of that contractual provision reads, as follows:

(b) Prior to [March 1, 2007], [Toronto–Dominion] shall not ... propose or initiate any Going Private Transaction un-

---

**24.** The objectors also complain that the plaintiffs failed to consider in their settlement negotiations that Sandler's fairness analysis suffered fundamental flaws resulting from its reliance on Banknorth's regulatory GAAP accounting, rather than the company's actual cash flows, for purposes of computing a discounted cash flow range of stock values. This

point, made in the affidavit of Frank C. Torcio, is amply rebutted in the reply affidavit of Brian R. Sterling of Sandler O'Neill.

**25.** *Francotyp–Postalia AG & Co. v. On Target Tech., Inc.*, 1998 WL 928382, at *6 (Del.Ch. Dec.24, 1998). The stockholders' agreement provides that it is governed by Delaware law.

less invited to do so by a majority of the [Special Committee]. Any Going Private Transaction effected during this period shall also be subject to the requirements of Section 2.2(c).

It is generally understood that to "initiate" a process means to commence or to effect a beginning to it.[26] Moreover, to "propose" means to form a purpose or intention, or to offer up a plan or scheme.[27] Accordingly, a plain reading of section 2.2(b) supports a robust argument that, because there was no preceding invitation from the Special Committee, Toronto–Dominion's prompting of exploratory negotiations or discussions as to a going private transaction, regardless of how skeletal, amounted to a breach of section 2.2(b)'s prohibition.

■ Other interrelated provisions of the stockholders' agreement also support this construction.[28] Most obviously, under section 2.2(c), Toronto–Dominion was allowed to "initiate and hold discussions" without prior invitation from the Special Committee, but only *after March 1, 2007*. Thus, examining sections 2.2(b) and 2.2(c) side-by-side provides a strong basis to argue that March 1, 2007 was the crucial date in determining who could take the first step in orchestrating a potential merger: before March 1, the Special Committee held the sole contractual right to start the transactional ball rolling by issuing an invi-

tation; after March 1, Toronto–Dominion could suggest a going private deal on its own accord.

Substantial extrinsic evidence also supports the above interpretation of the restrictions placed on Toronto–Dominion's freedom of action by the contract. The prospectus and proxy statement issued in connection with the merger through which Toronto–Dominion became Banknorth's majority stockholder described the parties' understanding of section 2.2 by stating:

> [Toronto–Dominion] may not initiate discussions regarding or engage in a going private transaction during the first two years after the completion of the merger unless requested to do so by the [Special Committee]. During the next three years, [Toronto–Dominion] may initiate discussions with the [Special Committee] regarding a going private transaction but only on a confidential basis and may not proceed with such a transaction unless authorized to do so by the [Special Committee].

The settling plaintiffs and the defendants argue that the main purpose of section 2.2(b) was to prevent Toronto–Dominion from launching a tender offer of the type discussed in *In re Pure Resources, Inc.*[29] But this argument is both unsupported by the plain language of the contract and by contemporaneous evidence of the contracting parties' intentions. Addi-

---

26. *See, e.g.,* BLACK'S LAW DICTIONARY 784 (6th ed.1990) (defining "initiate" as to "commence, start, originate, [or] introduce"); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 601 (10th ed.1993) (defining "initiate" as "to cause or facilitate the beginning of, set going").

27. *See, e.g.,* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 936 (10th ed.1993) (defining "propose" as "to form or put forward a plan or intention, to set before the mind (as for discussion, initiation, or action)"); *Knodel Common School Dist. No. 58 v. County Bd. of*

*Educ.,* 82 S.D. 185, 144 N.W.2d 38, 41 (1966) (defining "propose" in a similar fashion).

28. *See, e.g., OSI Systems, Inc. v. Instrumentarium Corp.,* 892 A.2d 1086, 1092 & n. 19 (Del.Ch.2006) (noting that proper interpretation of a provision often requires the court to read the contract as a whole and derive the meaning of particular clauses from the context of other terms).

29. *See generally In re Pure Resources, Inc. S'holders Litig.,* 808 A.2d 421 (Del.Ch.2002).

tionally, while the interpretation offered by the plaintiffs and the defendants has some practical appeal, it fails to address several other functional reasons why section 2.2(b) may have been executed—namely, to prevent Toronto–Dominion from initiating a merger before Banknorth had an opportunity to fully integrate and benefit from the series of acquisitions it planned to undertake shortly after Toronto–Dominion became the company's majority stockholder, or from doing so during a cyclical downturn in the banking market.

The record also supports a reasonably strong inference that Toronto–Dominion in fact initiated or suggested the merger transaction prior to the Special Committee's invitation on November 18, 2006. In December 2005, Toronto–Dominion's board discussed, at some length, the possibility of taking Banknorth private. The next month, Masrani and several other Toronto–Dominion representatives attended a meeting of Banknorth's Strategic Planning Committee where the topic of a going private transaction was first discussed. One day later, Verrill, an attendee of the meeting, sat down with the Special Committee to offer his thoughts on a potential merger with Toronto–Dominion. A reasonable inference from this sequence of events is that, having formulated a plan to take Banknorth private, Toronto–Dominion initiated a series of meetings with the specific purpose of opening merger negotiations with the Special Committee without a prior invitation. This inference is strengthened by the fact that Toronto–Dominion representatives had extensive contact with Condron before the Special Committee even retained legal or financial advisors. Ultimately, the record shows that Clark and Condron engaged in a near-constant series of discussions and negotiations from June to November 2006 during which the material terms of the transaction, including

price, were finalized. These discussions and negotiations occurred before the Special Committee issued its contractually-required invitation to Toronto–Dominion. Thus, based on the record submitted in connection with the settlement, the court concludes that there is substantial evidence to support a claim that the merger agreement is the product of the defendants' violation of the stockholders' agreement.

The defendants' ancillary arguments to the contrary do not alter the court's fundamental understanding of the contractual claim. Their position that Banknorth's minority stockholders were not harmed by a violation of section 2.2(b) misapprehends the apparent purposes of the provision, as well as the likelihood that, absent Toronto–Dominion's pressure on Banknorth's management, the Special Committee may not have considered a transaction at all before March 1, 2007. The defendants' contention that the stockholders' agreement could be modified or revised to permit conduct which would otherwise violate section 2.2(b) ignores both the contractual requirement in the agreement that all amendments be in a signed writing, and the lack of evidence that Toronto–Dominion and Banknorth ever considered such an amendment.

■ Finally, the defendants' reasoning that a breach of contract claim arising out of section 2.2(b) is derivative, and thus was extinguished by the merger, lacks force. According to *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, the determination of whether a claim is direct or derivative turns on two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[30] By

30. 845 A.2d 1031, 1033 (Del.2004).

claiming that Banknorth as a corporation suffered any resultant harm from a breach of section 2.2(b), the defendants take an overly myopic view of *Tooley*. It was the minority stockholders whose shares were cashed-out by an allegedly unfair process which purportedly contravened section 2.2(b). Toronto–Dominion, as Banknorth's majority stockholder, allegedly received the financial benefits of this distorted process by consummating a going private merger at an inopportune time. Therefore, a substantial argument can be made that it was the minority stockholders themselves who suffered harm from a breach of the restrictions in the stockholders' agreement, and it is to them that any monetary recovery should flow.[31]

 In any event, as is well-established in Delaware law, in a freeze-out transaction such as this one, the minority shareholders possess an entire fairness claim that requires that the court conduct a two-part examination into both fair price and fair dealing.[32] Equally fundamental is the notion that fair price and fair dealing are not viewed in isolation, but rather in conjunction, and that fairness as to one prong will not necessarily sterilize a transaction or immunize a defendant from liability.[33]

Although the objectors have adduced little evidence that the price Toronto–Dominion paid for the minority shares of Banknorth was outside the range of fairness *at the time the merger agreement was executed or completed*,[34] it does not necessarily follow that an entire fairness claim in this case is devoid of merit. The situation the Delaware Supreme Court addressed in *Rabkin v. Philip A. Hunt Chemical Corp.*[35] is analogous to the present facts. In *Rabkin*, a majority stockholder agreed, pursuant to terms of a stock purchase

---

**31.** *See generally Parnes v. Bally Entm't Corp.*, 722 A.2d 1243 (Del.1999) (holding that improper conduct by a fiduciary which has a direct impact on the merger price received by the stockholders is not necessarily derivative in nature).

**32.** *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983).

**33.** *Id.* ("The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger.... However, the test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."). *But see Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 748 (Del.Ch. 2007) (noting that extraordinarily fair price terms may allow a transaction to pass the entire fairness test despite a relatively unfair process and citing *Oliver v. Boston Univ.*, 2006 WL 1064169, at *25 (Del.Ch. Apr.14, 2006)); *Weinberger*, 457 A.2d at 711 ("However, in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger.").

**34.** Emphasis added. The objectors' expert does not conclude in his affidavits submitted to the court that $32.33 was an unfair price for Banknorth stock in November 2006. Furthermore, their expert fails to rebut the evidence adduced by the defendants' expert that Sandler's reliance on "push-down" accounting conventions and Banknorth's projected GAAP earnings, both of which were required by the federal administrative body charged with regulating financial institutions, was entirely proper. Indeed, it is common sense that the company's GAAP earnings would be used for a legitimately conducted discounted cash flow analysis, since those earnings reflect Banknorth's actual free cash flows, which are lower than the company's actual cash earnings because of legal constraints which require large financial institutions to meet certain capital reserve requirements.

**35.** 498 A.2d 1099 (Del.1985).

agreement, that if it bought the remaining outstanding shares of a Delaware corporation within one year from the date of the agreement, it would pay the minority stockholders "substantially equivalent value" to the price it paid to acquire its majority interest.[36] The plaintiffs in *Rabkin* complained that, despite the majority stockholder's long-held intentions to perform a freeze-out merger after its initial stock acquisition, the transaction was inequitably timed to occur shortly after the expiration of the contractual obligation in order to avoid the price commitment.[37] Relying on principles of equity espoused in *Schnell v. Chris–Craft Industries*[38] and the entire fairness analysis established in *Weinberger v. UOP, Inc.*,[39] the Delaware Supreme Court reversed the Court of Chancery's dismissal of the complaint, holding that the suspect timing of the merger successfully stated a claim for unfair dealing which, if true, could not be adequately remedied by an appraisal proceeding.[40]

The facts in this case are, if anything, stronger than those in *Rabkin* since the record here is indicative of an actual breach of contract. Thus, given its duty in the settlement context to consider the strength of the plaintiffs' claims, the court concludes that the class could likely sustain an unfair process claim at the motion to dismiss stage based on the timing of the merger and a *prima facie* violation of section 2.2(b) of the stockholders' agreement.

While the plaintiffs and the defendants point out that the claims of the minority stockholders in *Rabkin* ultimately failed on remand to the Court of Chancery,[41] this distinction is unavailing. As already pointed out, the present facts should create a stronger claim than the one upheld by the Delaware Supreme Court in *Rabkin* because here, unlike in that case, there is evidence that the defendants violated the express provisions of a binding contract. Such a possible breach of a contract forms a more powerful predicate on which to argue unfair dealing than does the alleged unfairness of delaying a proposal until a contractual price restriction expired by its terms.[42]

For all of these reasons, the court finds that the plaintiffs unreasonably chose not to pursue viable claims based upon a violation of section 2.2(b) of the stockholders' agreement and any resultant inequitable timing of the transaction. While expressing no opinion as to the ultimate merits of these causes of action, the court must conclude that, according to established principles of contract interpretation and Delaware case law, these claims have some substantial strength. A reasonable class representative in the plaintiffs' position certainly would have tried to extract substantial consideration for the settlement of these claims. That plainly did not happen here. Instead, the named plaintiffs and their counsel failed to pursue this claim and, as a result, agreed to settle the case for only meager consideration.

While this conclusion is enough to cause the court to reject the proposed settle-

36. *Id.* at 1100–01.

37. *Id.* at 1103.

38. 285 A.2d 437, 439 (Del.1971).

39. 457 A.2d at 711.

40. *Rabkin,* 498 A.2d at 1106–07.

41. *See generally Rabkin v. Philip A. Hunt Chem. Corp.,* 547 A.2d 963 (Del.Ch.1986).

42. *See Rabkin,* 498 A.2d at 1107 (citing *Schnell,* 285 A.2d at 439, for the principle that "inequitable conduct will not be protected merely because it is legal").

ment, the court will also briefly address the other issues raised.

B. *The Disclosures Included In The Proxy Statement Were Inadequate Consideration For The Release Of The Class Claims*

■ When class plaintiffs argue that supplemental proxy disclosures constitute adequate consideration for a settlement, a court must first look for evidence of causation—that is, the court must be satisfied that the disclosures were a direct result of the plaintiffs' work and negotiating posture. In the settlement context, this court has previously noted that an event that was a *fait accompli* before any agreement to settle was reached cannot serve as valid consideration for the release of class claims.[43]

A thorough examination of the record here reveals that most of the disclosures for which the plaintiffs claim partial credit were made primarily in response to SEC comment letters. In Banknorth's amended proxy filing of February 13, 2007, the defendants included, at the behest of the SEC, a discussion regarding the types of valuation analyses performed by Sandler, the sources of the financial information Sandler relied upon, and Sandler's previous engagements with Banknorth and Toronto–Dominion. Thus, although the plaintiffs can properly take credit for the

disclosure of certain supplemental information,[44] the most substantive disclosures—at least from the point of view of an investor seeking to determine the fairness of the merger price—are directly attributable to the work of the SEC's staff.[45] The court's conclusion that the plaintiffs' work lacks a strong causal link to the disclosures is further substantiated by the fact that much of the information the plaintiffs point to was made publicly available two days before execution of the parties' memorandum of understanding which supposedly documented the fruits of the plaintiffs' litigation efforts.

While the plaintiffs observe that disclosure issues are often raised by multiple sources due to the overlapping roles of the SEC and private plaintiffs, the parties seeking approval of a settlement must still convince the court that meaningful disclosures are a result of the plaintiffs' diligence. Indeed, if a disclosure-driven settlement is to have any merit at all, the plaintiffs should be able to point persuasively to information they obtained that will help a similarly-situated stockholder make a meaningful choice in deciding whether to approve a transaction. Allowing a settling plaintiff to claim as its own the results of the informational demands of federal regulators is not an acceptable alternative to this requirement.[46] Thus, the

43. *In re Cellular Commc'ns Int'l, Inc. S'holders Litig.*, 752 A.2d 1185, 1186–87 (Del.Ch. 2000).

44. For instance, the plaintiffs can claim credit for the disclosure regarding PCM's letter lambasting the Banknorth board for appointing Masrani as CEO, as well as the one concerning Condron's and Clark's beliefs that they could justify (respectively) prices higher and lower than $32.33 per share.

45. The court notes that Masrani's January 24, 2007 discussion of Banknorth's recent and future performance with industry analysts

was publicly available at that time. Thus, to the extent the plaintiffs' caused a summary of this meeting to be included in the amended proxy materials filed on February 13, their efforts merely resulted in duplication of information already available in the marketplace.

46. Tellingly, the memorandum of understanding, by negative implication, essentially concedes this piggybacking, and states:

In addition, *in substantial part as a result of, among other things,* discussions between and among the parties to the Action through Plaintiffs' Co–Lead Counsel, and

court concludes that the disclosures purportedly attributable to the plaintiffs' efforts in this case do not form a reasonable basis on which to approve the settlement.

### C. The Settlement Notice Submitted To The Class Claimants Was Inadequate

Under Delaware law, a notice of a class action settlement is legally adequate if it "contains a fair description of the proposed settlement, puts stockholders upon notice as to the general nature of the subject matter, and warns them that their substantial interests are involved."[47] While a notice "is not required to eliminate all occasion for initiative and diligence on the part of the stockholders,"[48] it cannot omit fundamental information regarding the settlement terms, since keeping class members informed of the potential outcome of the case directly implicates the plaintiffs' fiduciary obligations in conducting the litigation.

The notice here was inadequate in several respects.[49] First, the initial notice *completely omitted* the entire exhibit showing the disclosures that the plaintiffs say form part of the settlement consideration. Whether caused by administrative oversight or not, the plaintiffs, by neglecting to include this exhibit, failed to inform those stockholders whose interests they represented of a material basis for the settlement. When this omission was pointed out by the objectors, the fact emerged that the exhibit did not yet exist. This revelation was troubling since the exhibit should have been prepared in connection with the stipulation of settlement, if not earlier, and was meant to be the definitive statement of the additional disclosures that form the basis of the settlement. Eventually, a supplemental notice with a newly minted exhibit was circulated.

Second, the notice did not explain to the class members that the individual defendants and their affiliates would participate in the settlement fund. Despite the unusual nature of this aspect of the settlement, the plaintiffs attempt to justify this omission by relying on the portion of the notice that stated the settlement fund would be paid to holders of "Banknorth shares not held by [Toronto–Dominion] and payable on a pro rata basis to stockholders who receive the merger consideration payable in connection with the merger...."[50] Since the individual defendants do not own shares "held by Toronto–Dominion" and are themselves Banknorth stockholders, the plaintiffs say the class members were made aware of the treatment afforded the individual defendants. Class members, however, are not ciphers,

Defendants' Counsel, the final proxy statement will include the disclosures set forth in Exhibit A annexed hereto, which disclosures were not set forth in the Preliminary Proxy filed with the SEC prior to the negotiation of the Settlement.
Objectors' Ex. 1 at 2 (emphasis added).

**47.** *Geller,* 462 A.2d at 1080 (citing *Braun v. Fleming–Hall Tobacco, Co.,* 92 A.2d 302, 309 (Del.1952)).

**48.** *Id.*

**49.** The court rejects the objectors' other arguments regarding the adequacy of the notice. A diligent investor could have reviewed the proxy materials to determine the exact number of shares held by Suehrstedt and Verrill. Moreover, the objectors fail to provide any sort of explanation as to why the notice should have disclosed that PCM and another institutional investor were to be the two largest recipients of the settlement fund when the proxy statement expressly listed them as the second and third largest stockholders of Banknorth. *See Braun,* 92 A.2d at 309 (noting that stockholders are still required to exhibit some diligence on their own part to tie together insubstantial factual seams in the settlement notice).

**50.** Objectors' Ex. 40 at 8.

and a Banknorth stockholder of reasonable intelligence and investment acumen cannot be expected to parse through a settlement notice looking for evidence of the odd proposition that the individuals who are receiving a release are also entitled to the same monetary consideration as the class members.

## IV.

In sum, the plaintiffs' failure to address or leverage potentially meritorious claims involving section 2.2(b) of the stockholders' agreement, particularly when viewed in light of inadequacies in the settlement notice and the insubstantial nature of the plaintiff-generated disclosures in this case, requires the court to disapprove the proposed settlement. IT IS SO ORDERED.